**RECEIVED**

MAY 1 3 2011

**JAMES BONINI, Clerk**
CINCINNATI, OHIO

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**1:11 C V 313**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* | : |
| JEFFREY W. ADLER | : Civil Action No. _____ |
| c/o: Helmer, Martins, Rice & | : |
| Popham Co., L.P.A. | : |
| 600 Vine Street, Suite 2704 | : |
| Cincinnati, Ohio 45202 | : |
| | : |
| BRINGING THIS ACTION ON BEHALF | : |
| OF THE UNITED STATES OF AMERICA | : |
| | : |
| c/o Hon. Carter M. Stewart | : |
| United States Attorney | : **Complaint** |
| 221 East Fourth Street | : |
| Cincinnati, Ohio 45202 | : |
| | : |
| and Hon. Eric Holder | : |
| Attorney General of the United States | : |
| United States Department of Justice | : |
| 950 Pennsylvania Avenue N.W. | : |
| Washington, D.C. 20530, | : ***Filed under seal pursuant to*** |
| | : ***31 U.S.C. § 3720(b)(2)*** |
| Plaintiffs and Relator, | : |
| | : |
| vs. | : |
| | : Date Received: _____ |
| | : |
| General Electric Aviation Systems LLC | : |
| One Neuman Way | : |
| Cincinnati, OH 45215 | : |
| | : |
| Agent: CT Corporation | : UNITED STATES DISTRICT JUDGE |
| 1300 East Ninth Street | : |
| Cleveland, OH 44114 | : |
| | : |
| | : |
| Defendant. | : |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF PHOTOS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    GEAS SUPPLIES NONCONFORMING EXTERNAL FUEL TANKS TO THE UNITED STATES FOR USE IN THE NAVY F/A-18 HORNET. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Welding Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    GEAS' Quality System Fails To Comply With Contractual Specifications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.    GEAS SUPPLIES NONCONFORMING PARTS FOR MODELS OF BLACK HAWK HELICOPTERS TO THE UNITED STATES AND TO UNITED STATES' PRIME CONTRACTOR SIKORSKY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    The Long Term Agreement Between GEAS And Sikorsky. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Other Sikorsky/GEAS Contracts & Purchase Orders. . . . . . . . . . . 22

    C.    HSI Purchase Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    D.    Contracts Between GEAS And The United States Army. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    E.    Contracts Between GEAS And The United States Navy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    F.    Foreign Military Sales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    G.    GEAS Supplies Nonconforming Drag Beams. . . . . . . . . . . . . . . . 30

i

**Page**

1.  GEAS failed to cure deficiencies in Drag
    Beams and instead circumvented quality
    requirements........................................ 34

2.  GEAS failed to ensure that Drag Beams
    conformed to Sikorsky drawing requirements. .......... 36

H.  GEAS Knowingly Produces Black Hawk
    Components With Parts Made From
    Nonconforming Raw Materials............................ 41

1.  GEAS knowingly used Pins Bearings
    made from steel bar that did not meet
    Sikorsky's specifications to manufacture
    Shock Strut Assemblies and Main Landing
    Gear Assemblies. .................................... 41

2.  GEAS knowingly used Clips made from
    aluminum sheets that did not meet
    Sikorsky's specifications to manufacture
    Tail Landing Gears Assemblies........................ 43

3.  Relator alerts GEAS to its use of parts
    made with nonconforming raw material
    in the manufacture of components of
    Black Hawk Helicopters............................... 44

4.  GEAS manufactured additional
    components of Black Hawk helicopters
    with parts made from nonconforming
    raw material........................................ 46

I.  GEAS' Quality System Allows Nonconforming
    Parts To Be Knowingly Sold And Shipped To
    Sikorsky For Installation In Military Helicopters
    Sold To The United States................................ 49

1.  GEAS fails to issue NCMRs and obtain
    MRB review of discrepant parts from Sikorsky.......... 49

2.  GEAS fails to properly close NCMRs by
    obtaining MRB review of discrepant parts
    from Sikorsky. .................................... 50

ii

**Page**

          3.    Further evidence of the flawed nature of GEAS'
quality system. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

RULE 9(b), FED. R. CIV. P., ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

COUNT I
VIOLATION OF  31 U.S.C. § 3729(a)(1)(A) OF THE FALSE CLAIMS ACT. . . . . . . . . . . 55

COUNT II
VIOLATION OF 31 U.S.C. § 3729(a)(1)(B) OF THE FALSE CLAIMS ACT.. . . . . . . . . . . 56

COUNT III
31 U.S.C. § 3730(h), RETALIATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

# TABLE OF PHOTOS

**Page**

**Photo 1**, EA-18G Growler. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Photo 2**, External Fuel Tank. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Photo 3**, UH-60 Black Hawk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Photo 4,** Main Landing Gear Assembly
(Part Nos. 70250-22009-XXX & 71250-32100-XXX). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Photo 5**, Shock Strut Assembly for Main Landing Gears
(Part No. 70250-12051-XXX). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Photo 6**, Tail Landing Gear Assembly
(Part No. 70250-13100-XXX). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Photo 7**, Shock Strut for Tail Landing Gears
(Part No. 70250-13101-XXX). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Photo 8**, Drag Beam Without Bushings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Photo 9**, Drag Beam With Bushings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

iv

**INTRODUCTION**

1.     This is a *qui tam* action brought by Relator Jeffrey W. Adler under the

False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, in the name of the United States to recover

damages, civil penalties and other relief, due to false claims presented or caused to be

presented to the United States by General Electric Aviation Systems, LLC ("GEAS"), a

wholly-owned subsidiary of General Electric Co., in connection with the production of

fuel tanks for the Navy's F/A-18 Hornet Jet Fighter and the production of components

such as Landing Gears, Drag Beams, and Shock Struts for Black Hawk helicopters.

2.     Relator also brings an illegal retaliation claim against Defendant GEAS,

pursuant to 31 U.S.C. § 3730(h) of the False Claims Act, for work place retaliation that

he suffered in connection with his internal investigation of the False Claims Act

violations described in paragraph 1 above and for reporting these False Claims Act

violations both to GEAS management and to in-house legal investigators located at

GEAS' headquarters in Cincinnati, Ohio.

**PARTIES**

3.     Relator Jeffrey Adler ("Adler") is a resident of the State of California and a

U.S. citizen. Relator Adler is currently a Manufacturing Engineer and employee of

GEAS, working at GE Aviation Mechanical Systems, 2040 E. Dyer Road, Santa Ana,

California, 92705 ("GEAS facility").

4.     Adler was a Project Manager with Smiths Aerospace Mechanical Systems

("Smiths Aerospace") from 2006 through its acquisition by the General Electric

Company's business unit General Electric Aviation ("GE Aviation") in May, 2007. After

the acquisition, Adler became a Project Manager for GEAS. On August 1, 2008, GEAS

1

promoted Adler to a Manufacturing Manager over Production Cell 1, which was responsible for the F/A-18 External Fuel Tank production as well as all Assembly and Testing (including assembly and testing of the helicopter Main Landing Gears and components such as the Shock Struts and Drag Beam Assemblies). Approximately 50 GEAS employees reported to Adler in his capacity as Manufacturing Manager of Cell 1.

5.      After pointing out flaws in GEAS' quality system, including many of the matters that comprise this Complaint, in January 2010 Adler was demoted to a Manufacturing Engineer with no supervisory authority.

6.      Defendant GEAS is a subsidiary of the General Electric Company and its business unit, GE Aviation. GEAS is a global provider of electrical power systems, avionics, actuation and landing gears, aerostructures and propeller systems to builders and operators of military and civilian aircraft. GE Aviation is headquartered in Cincinnati, Ohio, while the parent company, General Electric Company, is headquartered in Fairfield, Connecticut.

## JURISDICTION AND VENUE

7.      This action arises under the United States False Claims Act, 31 U.S.C. §§ 3729 *et seq*. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

8.      There was no "public disclosure," as that term is defined in the False Claims Act, 31 U.S.C. § 3730(e)(4)(A), of the false claims or allegations herein, prior to the filing of this complaint.

9.      To the extent that the United States has any knowledge of the false claims or statements alleged herein, Relator is the "original source" of that knowledge, as that

2

term is defined in the False Claims Act, 31 U.S.C. § 3730(e)(4)(B), based upon his direct and independent knowledge of information upon which the allegations herein are based, which was voluntarily provided to the Government before this Complaint was filed.

10.     Venue in the United States District Court for the Southern District of Ohio, Western Division is proper pursuant to 31 U.S.C. § 3732(a) since Defendant GE Aviation's headquarters is located in this judicial district, Defendant does business in this judicial district, corporate counsel located in GE Aviation's headquarters in this judicial district twice visited Relator at GEAS' Santa Ana facility to discuss matters that underpin many of these false claims, and many of the false claims for payment were submitted to and paid by the Defense Finance and Accounting Service ("DFAS") in Columbus, Ohio.

## FACTS

11.     Defendant GEAS operates a facility in Santa Ana, California, that supplies aviation components to various federal defense contractors who produce fighter jets and helicopters for the Department of Defense. The GEAS facility also supplies some aviation components directly to the United States pursuant to separate contracts.  In addition, GEAS supplies fighter jet and helicopter components to foreign governments under the foreign military sales program. The sales under these military contracts comprise approximately 94% of GEAS's total sales.

12.     During the period from 2008 through the present, GEAS knowingly delivered components to its customers that failed to comply with production standards and quality inspection requirements detailed in their purchase orders, drawings, specifications, and contracts while, nevertheless, falsely certifying to its customers that

3

each component part and assembly was manufactured, inspected, and tested in accordance with all applicable drawings, specifications, and approved processes.

## I.     GEAS SUPPLIES NONCONFORMING EXTERNAL FUEL TANKS TO THE UNITED STATES FOR USE IN THE NAVY F/A-18 HORNET

13.     The F/A-18 Hornet is a Navy jet strike fighter capable of flying from the United States Navy's twelve aircraft carriers as well as from ground air bases. The forward fuselage and wings are made by McDonnell Douglas/Boeing Defense, Space and Security, the center and aft fuselage is made by Northrop Grumman, the radar is made by Hughes Aircraft, and the engine and external fuel tanks ("**EFT**") are made by Defendant GEAS. The F/A-18 Hornet is usually equipped with two inboard wing stations for external fuel tanks or air-to-ground weapons and one centerline station for external fuel tanks or air-to-ground weapons. The F/A-18 can be equipped with up to five external fuel tanks. Each external fuel tanks is approximately 18 feet in length and holds 480 gallons of jet fuel.

14.     In this case, the EFTs were produced for use on the F/A-18E/F Super Hornet strike fighter and the EA-18G Growler, a carrier-based electronics warfare aircraft which is a specialized version of the two-seat F/A-18E/F Super Hornet. Below are photos of an EA-18G Growler and an EFT:

4

**EA-18G Growler**



**External Fuel Tank**



15.     In May 2007, GE Aviation acquired Smiths Aerospace. All relevant parts of Smiths Aerospace then became GEAS, a subsidiary of GE Aviation, a business unit of General Electric Company.

16.     At that time, Smiths Aerospace was producing EFTs for the F/A-18 Hornet fighters pursuant to a March 24, 2000, Naval Air Systems Command ("**NAVAIR**"), Contract: N00421-00-C-0433. This contract was originally issued to TRIG Aerospace Company, a division of Integrated Aerospace, Inc. Integrated Aerospace in turn was acquired by Smiths Aerospace in October, 2004.

17.     From 2007 through the present, the GEAS facility has fabricated, inspected, tested and delivered F/A-18 EFTs to the Navy under Navy Contract: N00421-00-C-0433.

18.     As required by Section C of Contract N00421-00-C-0433, GEAS must "fabricate, assemble, inspect, test and deliver the 480 gallon fuel tank in accordance with the Statement of Work (SOW) and Purchase Description."

19.     At all relevant times, Defendant GEAS and their management personnel knew that the EFTs for the F/A-18 Hornet fighter were being produced pursuant to a Federal contract and that GEAS was being paid for its performance with Federal funds.

20.     GEAS submits its claims for payment under Navy Contract N00421-00-C-0433 to DFAS in Columbus, Ohio.

21.     The Navy contract for F/A-18 EFTs, Contract N00421-00-C-0433, is administered by the Defense Contract Management Agency ("DCMA") office in Santa Ana, California.

6

### A.     Welding Violations

22.     At all times, the Navy, through its contract specifications and drawings, required that welding in the production of the F/A-18 EFTs be performed by welders qualified and certified in accord with American Welding Society specification AWS D17.1 sections 4.2 and 4.3.

23.     Despite this requirement, GEAS knowingly used welders in the fabrication of F/A-18 Hornet EFTs who were not properly certified.

24.     After NAVAIR & Defense Contract Management Agency ("DCMA") began an audit of GEAS, GEAS disclosed to NAVAIR on May 21, 2009 that its welders lacked certifications of their qualifications. Because its welders lacked proper certification, GEAS stopped welding as of February 13, 2009.

25.     On information and belief, the certifications of GEAS' welders expired at some time in 2007.

26.     GEAS did eventually hire a consultant, George Rolla, to train and recertify its three welders. Mr. Rolla recertified two of these welders, Allan Trinh and Daniel Diaz, on various welding procedures in March through July, 2009 using test welds as required by AWS D17.1 section 4.2. A third welder, Tam Trinh, was recertified as to only one welding procedure on a test weld by Mr. Rolla during this time, as he was out due to a back injury.

27.     However, GEAS became dissatisfied with Mr. Rolla, finding him to be too thorough in his certification and jeopardizing shipping schedules. GEAS also believed that Mr. Rolla was too expensive and that they could get someone else for less cost. GEAS then found a new consultant who eventually replaced Mr. Rolla, William Gaw.

Mr. Rolla's last day at GEAS was November 9, 2009.

28.    On August 8, 2005, Mr. Gaw qualified Tam Trinh on a production piece for an EFT, claiming that AWS D17.1 section 4.3.7.5 permitted such a certification. However, AWS D17.1 section 4.3.7.5 only allows welder qualification on a production weld "[w]hen none of the test welds described above [in AWS D17.1 section 4.3.7] are applicable to a given production weld." Because the weld Tam Trinh was qualified on was a square butt joint, complete joint penetration weld, the test welds described in AWS D17.1 section 4.3.7 were applicable to this production piece.

29.    On March 25, 2009 Mr. Rolla had qualified welder Allan Trinh to the same welding procedure using a test weld that Mr. Gaw qualified Tam Trinh to on a production weld on August 8, 2009.

30.    From 2007 to February 13, 2009, GEAS knowingly used three welders in the fabrication of F/A-18 Hornets EFTs who were not properly certified. And from August 5, 2009 to November 26, 2009, when Mr. Tam Trinh left GEAS, GEAS knowingly used one welder in the fabrication of F/A-18 Hornets EFTs who qualified under the proper procedure.

31.    On information and belief, Tam Trinh performed additional welds on the EFTs in 2009 that he was never qualified to perform under any provision of the AWS D17.1.

32.    This defective procedure was brought to the attention of GEAS management—Sampath Dabare (Site Leader), Carl Roberts (Quality Assurance Manager), and Chad Knapke (Fabrication and Tanks Team Leader)—by Relator in approximately July of 2009, but GEAS' management team decided to continue to use

8

this unqualified welder.

33.    Relator also discussed this improper welder qualification procedure with GE Aviation Quality and Legal personnel headquartered in Cincinnati, Ohio. GE Aviation Quality and Legal failed to take any corrective action.

**B.    GEAS' Quality System Fails To Comply With Contractual Specifications**

34.    During the period from 2008 through the present, GEAS issued Non-Conforming Material Reports ("**NCMRs**") regarding nonconformities in EFTs that GEAS manufactured. However, these NCMRs were not properly closed and the EFTs were shipped even though there was no disposition of the very contractual nonconformities raised in each NCMR. Nor was any Material Review Board ("**MRB**") variance granted.

35.    For example, the following chart describes some instances where this occurred:

| NCMR | Nonconformance | Disposition & Shipment |
|------|----------------|------------------------|
| NCMR No. 520160 9/23/2008<br><br>Part No. 1180000-1<br><br>Serial No. IA0837 | Fuel Tank failed Acceptance Test: 4.5.2.9: not comply with fuel flow time 4.5.2.11: not comply with fuel flow rate 4.5.2.12: does not turn off fuel pump in tank when tank is full. | No disposition, no MRB, no signatures, yet NCMR closed out / voided and part shipped 9/26/2008. |

| NCMR | Nonconformance | Disposition & Shipment |
|---|---|---|
| NCMR No. 520161 9/23/2008  Part No. 1180000-1  Serial No. IA0785 | Fuel Tank Assembly failed Electrical Test | No disposition, no MRB, no signatures, yet NCMR closed out / voided and part shipped 9/30/2008. |
| NCMR No. 520232 11/7/2008  Part No. 1180000-1  Serial No. IA0889 | Fuel Tank Fabrication / Assembly -Tool marks on the Main Frame Assembly | Disposition: SCRAP However, part shipped on 12/5/2008 |
| NCMR No. 520241 11/21/2008  Part No. 1180000-1  Serial No. IA0770 | Fuel Tank Fabrication / Assembly -Electrical Test Failed | No disposition, no MRB, no signatures, yet NCMR closed out / voided and part shipped on 12/11/2008. |

II.    **GEAS SUPPLIES NONCONFORMING PARTS FOR VARIOUS MODELS OF BLACK HAWK HELICOPTERS TO THE UNITED STATES AND TO THE UNITED STATES PRIME CONTRACTOR, SIKORSKY**

A.    **The Long Term Agreement Between GEAS and Sikorsky**

36.    GEAS supplies Sikorsky Aircraft Corporation ("Sikorsky"), a subsidiary for United Technologies, Inc., with the component parts for various models of military helicopters that Sikorsky supplies to the United States military.

37.    Beginning in 2007 through the present, Sikorsky has issued purchase orders to GEAS or its predecessor, Smiths Aerospace, for over 1,200 military helicopter components, such as Landing Gears, Shock Struts, and Drag Beams (which are sold both as independent parts and as a component of Landing Gears). These component parts are shown on the photo of the Sikorsky Black Hawk helicopter below and separately:



**UH-60 Black Hawk**



**Main Landing Gear Assembly**
(Part Nos. 70250-22009-XXX & 71250-32100-XXX)



**Shock Strut Assembly for Main Landing Gears**
(Part No.  70250-12051-XXX)

12

### Tail Landing Gear Assembly
(Part No.  70250-13100-XXX)



### Shock Strut for Tail Landing Gears
(Part No.  70250-13101-XXX)



13

38.     On September 6, 2007 Smiths Aerospace (then owned by GE Aviation) entered into a Memorandum of Agreement ("**MOA**") by which Sikorsky agreed to purchase a number of parts for various models of Black Hawk helicopters from Smiths Aerospace at a set price.

39.     Eventually, GEAS and Sikorsky modified their contractual relationship by entering into a Long Term Agreement, Contract No. 4701001433 ("**LTA**"), which applies through December 31, 2012.  The LTA incorporates the MOA by reference.

40.     Unless the parties agreed otherwise, the terms of purchase orders issued under the MOA are the October 5, 2005 *Sikorsky Aircraft Standard Terms and Conditions of Purchase*, and the June 22, 2007 *Sikorsky Aircraft Corporation Supplemental Terms and Conditions of Purchase*. Likewise, the LTA requires that GEAS comply with the current revision of Sikorsky's *Standard Terms and Conditions of Purchase,* ("**SA 908**"), Sikorsky's *Strategic Supplier Quality System* ("**SSQS**"); and, with additional terms and conditions as specified at Sikorsky's supplier website: https://suppliers.sikorsky.com.

41.     The language of the MOA demonstrates that the United States was Sikorsky's customer for helicopters that Sikorsky would manufacture with component parts purchased from GEAS, as it states that Smiths Aerospace "shall accept only FAR and DFAR clauses, as required by Sikorsky Aircraft's customer." Likewise, the LTA requires that upon notice that the goods being provided are in support of a prime contract with the United States, GEAS is required to comply with all Federal Acquisition Regulations and Defense Federal Acquisition Regulation Supplement provisions required by law or regulation or necessary for Sikorsky to comply with the procurement

14

regulations.

42.    Thus, the requirements imposed upon GEAS by Sikorsky were, upon information and belief, requirements of the United States upon all prime and sub tier contractors. On information and belief, the terms of the LTA and all contracts between Sikorsky and GEAS are terms that the United States requires Sikorsky to impose on GEAS pursuant to the prime contract between the United States and Sikorsky.

43.    Many of Sikorsky's purchases of helicopter components from GEAS are made pursuant to the LTA. Sikorksy's Purchase Orders made under the LTA are assigned Sikorsky Purchase Order No. 5701001433 and the GEAS Sales Order No. 15615. This Purchase Order No. is also used when GEAS performs Repair & Overhaul on products for Sikorsky.

44.    GEAS reviews each Purchase Order it receives from Sikorsky before acceptance. In accepting Sikorsky's Purchase Orders, representatives from GEAS Contracts, Manufacturing Engineering, Quality, Production, and Planning Departments as well as a GEAS Vice President sign a Contract Review Form (SA-QAF061F), affirmatively indicating that the helicopter components Sikorsky is ordering are for "Military Application," that there are "Drawings Available" and that "Quality terms [are] clear & acceptable."

45.    The LTA requires that GEAS immediately notify Sikorsky in writing if GEAS is unable to supply Sikorsky with any goods that do not comply with the terms of the LTA, drawings, or specifications.

46.    Upon receipt of such a notification of failure of GEAS to supply Sikorsky with goods compliant with the terms of the LTA, drawings, or specifications, Sikorsky

15

has the right to terminate the order, among other remedies.

47.     Pursuant to the LTA, GEAS is required to provide First Article Inspections and qualification testing as defined by Sikorsky Engineering Drawings.

48.     At all relevant times from 2007 through the present, Sikorsky's SA 908, *Standard Terms and Conditions of Purchase*, requires that GEAS:

a.     comply with all Aerospace Supplier Quality Requirements (ASQR-01) requirements, specifications, drawings, instructions, and standards;

b.     only tender goods to Sikorsky that have passed inspection in accordance with applicable inspection systems and otherwise conform to all requirements of a purchase order;

c.     warrant to Sikorsky that all goods provided under a purchase order be free from defects in material and workmanship, free from defects in design if the design is not provided by Sikorsky, and be manufactured in strict accordance with the Sikorsky specifications and drawings;

d.     execute Certificates of Compliance, Form SA 876, certifying that the goods delivered to Sikorsky meet all applicable specifications and drawing requirements;

e.     create and execute a Material Certificate showing compliance with requirements listed on the applicable specifications for each purchase order, including chemical, physical, and other related requirements;

f.     execute a certificate stating that all goods supplied under a purchase order were inspected and are in full compliance with all applicable drawings and specifications;

g.     flow down all applicable requirements of a purchase order to GEAS' lower

16

tier suppliers, in accord with ASQR-01/AS 9100 and, if there is any change in a lower tier supplier's goods, GEAS must deliver prior to delivery of any goods an independent certification that the changes conform to the requirements of the purchase order, including but not limited to safety, performance, reliability, interchangeability, service life, weight or appearance;

      h.     produce in strict accordance with Flight Safety Parts requirements of the purchase order and SA 908, all Flight Safety Parts or assemblies containing Flight Safety Parts (Sikorsky, in its absolute discretion, designates what are Flight Safety Parts);

      i.     execute an SA Form 5182, "Supplier's Inspection Record for Reportable Characteristics" for hidden dimensions or characteristics of delivered goods based upon inspections individually conducted at GEAS' facility;

      j.     designate in GEAS' subcontracts with lower tier suppliers that their subcomponents are being supplied to Sikorsky and that the subcomponents are Flight Safety Parts and identify all applicable documents, drawings, and specifications;

      k.     ensure that Certifications for all processes from GEAS' subcontractors shall also indicate that the goods produced are for Sikorsky and that the subcomponents are Flight Safety Parts;

      l.     only use suppliers of Flight Safety Parts or processes that are approved by Sikorsky;

      m.     be able to identify and trace all Flight Safety Parts in accord with Sikorsky's approved frozen planning, SS9211 and SS8798, in addition to a completed form SA5193;

      n.     maintain at all times a Sikorsky-approved quality system;

17

o. not make any changes to GEAS' Flight Safety Parts Documentation,[1]
Critical Characteristics or Processes, or other processes or characteristics of goods frozen
by Sikorsky, or use any alternate material, without prior written approval of Sikorsky
(GEAS is authorized to make minor changes only if they are expressly reserved to GEAS'
discretion in the Flight Safety Parts Documentation);

p. develop and maintain as part of GEAS' Flight Safety Parts Documentation,
a process for verification and certification of compliance with all the requirements of the
Flight Safety Parts Documentation, which includes a system to certify and verify that
each Critical Characteristic or Process is strictly complied with, and that the goods were
manufactured or processed in compliance with the Flight Safety Documentation; and,

q. not use, or seek approval for the use, of any Non-Conforming Material, for
which a Non-Conforming Material Rejection Report (NMRR/DR) has been filed, in
connection with a Critical Characteristic or Process.

49. At all relevant times from May 2007 through the present, Sikorsky's SA
908, *Standard Terms and Conditions of Purchase*, applied to GEAS in the production of
parts for Sikorsky. SA 908 also provided that Sikorsky retained design responsibility for
the design and interface requirements on all specifications and source control drawings.
At all times relevant to this action, GEAS did not retain design responsibility.

---

[1] Flight Safety Parts Documentation is: all records and documentation related to
the manufacture, testing, storage, handling and all other matters related to the integrity
and quality of the goods produced by GEAS, including operation sheets, training
records, routing guides, parts traceability procedures, planning and processing
documentation, and quality assurance and inspection processes and procedures. Once
Sikorsky approves Flight Safety Parts Documentation, including operations identified by
Sikorsky as Critical Characteristics or Processes, they are deemed "*frozen*" and may not
be altered without the written approval of Sikorsky.

18

50.     GEAS was always required to submit to Sikorsky documentation describing any non-conformances which affect or involve:

    a.      safety, performance, reliability, interchangeability, service life, weight or appearance of the produced good, relative to GEAS' design responsibility Drawings; and

    b.      any aspect of a produced good which is, or has components which are, classified as Critical Parts by Sikorsky.

51.     For nonconforming parts, at all relevant times from May 2007 through the present, Sikorsky's SA 908, *Standard Terms and Conditions of Purchase*, required that GEAS submit to Sikorsky a Request for Waiver or Deviation (DD Form 1694 or a letter in a format acceptable to Sikorsky) at the earliest practicable time, but always prior to the Delivery Date specified in the Purchase Order, with sufficient time for Sikorsky to analyze the non-conformity and formulate an action plan or appropriate disposition.

52.     All goods which Sikorsky dispositioned to GEAS for rework or repair must, immediately upon GEAS' receipt and at all times in GEAS' possession through re-shipment to Sikorsky, be clearly identified as Dispositioned Goods and segregated from conforming goods.

53.     Despite these contractual requirements, GEAS, during the period between May 2007 and the present, produced and continues to produce helicopter components that are not in compliance with the terms of the its contracts, its drawings, or specifications.

54.     As explained in detail herein, GEAS's entire quality assurance program was riddled with defects and inconsistencies rendering it and the parts it produced noncompliant with contract quality requirements.  GEAS knowingly violated

19

requirements for raw materials, welder certifications, inspection and acceptance of work. It also manipulated inspections, and ignored Nonconforming Material Reports ("NCMRs") in shipping without disclosure to Sikorsky materials that were nonconforming to drawing, specification or other contract requirements. All the while, GEAS knowingly falsely certified that its helicopter components, such as landing gears, drag beam assemblies, shock struts, and all of their component parts met contract requirements, drawings and specifications.

55.    At all relevant times, Defendant GEAS and their management personnel knew that these helicopter components were being produced pursuant to Federal contracts and that GEAS was being paid for its performance with Federal funds.

56.    Certain of the helicopter components produced by GEAS, such as Drag Beams, are designated as Flight Critical Hardware and are the subject of stringent inspection standards as part of the Sikorsky-United States prime contract, as well as the Sikorsky-GEAS contract.

57.    As discussed above, GEAS' contracts/purchase orders with Sikorsky require that all parts be manufactured and inspected to the Sikorsky-provided drawings, i.e., all parts, components or assemblies must be manufactured to the Sikorsky drawing, maintaining all material, features and processes described in the drawing. Any variation from the Sikorsky drawings is cause for rejection.

58.    When a part is nonconforming, GEAS has three options: (1) scrapping the part, (2) reworking the part back into compliance with drawing specifications, or (3) submitting the part to Sikorsky for Material Review Board ("MRB") review.

59.    Because GEAS products must be made to the Sikorsky drawings, GEAS

20

does not have MRB authority to accept non-conforming components. The MRB

functions are performed by the Sikorsky Aircraft Material Review Board in accord with

ASQR-01, *Sikorsky Aircraft Supporting Documentation*, ¶ 5.0. Accordingly, any

component or assembly that GEAS produces that is outside of the parameters of the

Sikorsky drawings or otherwise discrepant to the requirements of the contract must be

authorized or approved for repair by Sikorsky.

60.     Once the part is submitted to Sikorsky for MRB review, there are typically

three dispositions that Sikorsky may direct for a non-conforming or rejected part or

assembly: (1) use the part as-is because the non-conformance will not affect form, fit, or

function; (2) scrap the part; or, (3) repair the part or assembly. Once Sikorsky MRB

determines that a part may be subject to a use-as-is, scrap, or repair notice, GEAS must

follow Sikorsky's MRB directives. This is the only process whereby otherwise discrepant

parts or assemblies may be eventually accepted and properly shipped to Sikorsky for use

in its helicopters.

61.     GEAS' contracts with Sikorsky require that all helicopter components be

built according to the drawings provided by Sikorsky. The Sikorsky-GEAS contract also

requires that GEAS maintain a quality system that complies with AS9100 to capture any

discrepancies to the Sikorsky contract and drawings.

62.     Sikorsky's drawings incorporate by reference Sikorsky's ***Drawing***

***Interpretation Manual*, SS9209**. The Sikorksy *Drawing Interpretation Manual*

contains the following requirements:

a.     "A4.5 <u>Product Quality</u>. Parts must meet all drawing requirements and

Sikorsky Aircraft (SA) Quality Assurance requirements. Any deviation from these

21

requirements shall be unacceptable unless it is specifically approved by SA through the Quality Assurance Department."

     b.    "A6.0 Rejections. Parts not conforming to this standard or to authorized modifications, such as Engineering Change Notice (ECN), Engineering Order (EO), Request to Engineering (RTE), etc. will be subject to rejection."

    63.    Pursuant to the terms of its contracts, the claims for payment that GEAS issues to Sikorsky include Certificates of Conformance certifying that: "the component parts and assemblies have been manufactured, inspected, and tested in accordance with the applicable drawings, specifications, and approved process in accordance with the requirements of the Purchase Order and/or Contract."

     **B.**    **Other Sikorsky/GEAS Contracts and Purchase Orders**

    64.    GEAS also supplies Sikorsky with components for military helicopters pursuant to other Contracts & Purchase Orders. These Purchase Orders incorporate by reference the terms of SA-908, the Strategic Supplier Quality System ("SSQS"), and other terms applicable to the quality aspects of the Purchase Order set forth at https://myutc.utc.com/sikorskysupplier. These Purchase Orders include the following:

     a.    Sikorsky Purchase Order No. 5500026913 / GEAS Sales Order 14151, dated 4/27/2007, ordering 23 Main Landing Gear Assemblies LH[2] at $29,920.00 each (Part No. 70250-32100-046) and 23 Main Landing Gear Assemblies at $29,920.00 each (Part No. 70250-32100-052);

     b.    Sikorsky Purchase Order No. 5500036501 / GEAS Sales Order 14508,

---

[2] LH = Left Hand.

dated 11/26/2007, ordering 1,193 Drag Beam Assemblies at $9,047.23 each (Part No. 70250-22010-043);

      c.     Sikorsky Purchase Order No. 5500051891 / GEAS Sales Order No. 15232, dated 12/12/2008, ordering 20 Main Landing Gear Gray LH at $20,998.35 each (Part No. 70250-22009-041);

      d.     Sikorsky Purchase Order No. 5500051914 / GEAS Sales Order No. 15233, dated 12/12/2008, ordering 20 Main Landing Gear Gray RH[3] at $20,998.35 each (Part No. 70250-22009-042);

      e.     Sikorsky / GEAS Contract No. 4700996557, dated 1/30/2009 (Purchase Orders issued under this Contract are given Purchase Order No. 5700996557);

      f.     Sikorsky Purchase Order No. 5500053909 / GEAS Sales Order No. 15351, dated 2/4/2009, ordering Main Landing Gear Gray LH at $20,998.35 (Part No. 70250-22009-041);

      g.     Sikorsky Purchase Order No. 5500053910 / GEAS Sales Order No. 15352, dated 2/4/2009, ordering Main Landing Gear Gray RH at $20,998.35 (Part No. 70250-22009-042);

      h.     Sikorsky Purchase Order No. 5500054467 / GEAS Sales Order No. 15362, dated 2/16/2009, ordering 16 Main Landing Gear Assemblies at $27,693.11 (Part No. 71250-32100-041);

      i.     Sikorsky Purchase Order No. 550054937 / GEAS Sales Order No. 15385, dated 2/26/2009, ordering 1 Drag Beam Axle Assembly at $ 16,150.00 (Part No. 70250-

---

[3] RH=Right Hand.

23

12105-041);

      j.    Sikorsky Purchase Order No. 4500056409 / GEAS Sales Order No. 15484, dated 4/14/2009, ordering 6 Drag Beam Axle Assemblies at $8,965.00 each (Part No. 70250-12105-044) and 6 Drag Beam Axle Assemblies $9,741.00 each (Part No. 70250-12105-045);

      k.    Sikorsky Purchase Order No. 5500057898 / GEAS Sales Order No. 15506, dated 4/30/2009, ordering 6 Main Landing Gear Assemblies Gray LH at $20,998.35 each (Part No. 70250-22009-041), 2 Main Landing Gear Assemblies Gray RH at $20,998.35 each (Part No. 70250-22009-042), and 10 Shock Strut Assemblies - Main Landing Gear at $13,165.70 each (Part No. 70250-12051-048);

      l.    Sikorsky Purchase Order No. 5500059099 / GEAS Sales Order No. 15564, dated 5/29/2009, ordering 8 Main Landing Gear Gray LH at $20,998.35 each (Part No. 70250-22009-041), 8 Main Landing Gears Gray RH at $20,998.35 each (Part No. 70250-22009-042), and 10 Shock Strut Assemblies - Main Landing Gear at $13,165.70 each (Part No. 70250-12051-048);

      m.    Sikorsky Purchase Order No. 5500060299 / GEAS Sales Order No. 15597, dated 6/26/2009, ordering 6 Main Landing Gears Gray LH at $20,998.35 each (Part No. 70250-22009-041), 6 Main Landing Gears Gray RH at $20,998.35 each (Part No. 70250-22009-042), 6 Landing Gear Assemblies at $16,457.12 each (Part No. 70250-13100-046), and 6 Shock Strut Assemblies - Main Landing Gear at $13,655.00 each (Part No. 70250-12051-048);

      n.    Sikorsky Purchase Order No. 5500049095 / GEAS Sales Order No. 15599, dated 6/30/2009, ordering 400 Drag Beam Assemblies at $10,331.43 each (Part No.

70250-22010-043);

o.    Sikorsky Purchase Order No. 550026886, dated 11/13/2009, ordering 15 Drag Beam Assemblies at $10,283.00 each (Part No. 70250-12105-043) and 19 Drag Beam Assemblies at $10,283.00 each (Part No. 70250-12105-043);

p.    Sikorsky Purchase Order No. 5500066916 / GEAS Sales Order No. 15881, dated 1/6/2010, ordering 1 Drag Beam Axle Assembly at $15,876.00 (Part No. 70250-12105-041) and 2 Drag Beam Axle Assemblies at $15,876.00 each (Part No. 70250-12105-042);

q.    Sikorsky Purchase Order No. 5500078332 / GEAS Sales Order No. 16647, dated 1/20/2010, ordering 20 Drag Beam Axle Assemblies at $10,331.43 (Part No. 70250-22010-043); and

r.    Sikorsky Purchase Order No. 5500066134 / GEAS Sales Order No. 16389, dated 2/17/2011, ordering 653 Drag Beam Assemblies at $10,331.43 each (Part No. 70250-22010-043).

65.    Moreover, Sikorsky has issued several other Contracts and Purchase Orders to GEAS. These include Contract No. 4500086111 and Purchase Order Nos. 5500008843, 5500015869, 550026886, 5500041745, 5500041803, 5500042135, 5500042628, 5500043712, 5500042632, 5500043950, 5500044518, 5500044551, 5500044552, 5500045617, 5500045620, 5500047197, 5500047343, 5500047488, 5500048863, 5500048918, 5500049259, 5500049312, 5500050228, 5500050230, 5500050231, 5500066511, 5700043712 and 5700996999.

66.    Pursuant to the terms of these contracts and purchase orders, the claims for payment that GEAS issues to Sikorsky include Certificates of Conformance certifying

25

that: "the component parts and assemblies have been manufactured, inspected, and tested in accordance with the applicable drawings, specifications, and approved process in accordance with the requirements of the Purchase Order and/or Contract."

67.     As explained in paragraph 42, above, on information and belief, the terms of all contracts and purchase orders between Sikorsky and GEAS are terms that the United States requires Sikorsky to impose on GEAS pursuant to the prime contract between the United States and Sikorsky.

**C.     HSI Purchase Orders**

68.     GEAS also supplies helicopter components to Sikorsky's subsidiary, Helicopter Support Inc. ("HSI"). All part sold to HSI are to be manufactured in accord with Sikorsky drawings. These Purchase Orders include the following:

a.     HSI Purchase Order No. 72143 / GEAS Sales Order No. 15440, dated 3/27/2009, ordering 2 Drag Beam Axel Assemblies at $16,150.00 each (Part No. 70250-12105-041);

b.     HSI Purchase Order No. 72546 / GEAS Sales Order No. 15487, dated 4/22/2009, ordering 6 Drag Beam Assemblies at $10,517.00 each (Part No. 70250-22010-043); and

c.     HSI Purchase Order No. 82734 / GEAS Sales Order No. 15809, dated 11/17/2009, ordering 8 Drag Beam Assemblies at $2,200.00 each (Part No. 70250-12105-043).

69.     GEAS has also supplied parts to HSI under HSI Purchase Order Nos. 37003, 37820, 38348, 45662, 48006, 48394, 49597, 51118, 58942, 64110, 67813, and 82151.

26

70.     All of HSI's Purchase Orders indicate that the terms of the Purchase Order include SIKORSKY's Supplier Quality System Requirements found in ASQR-01 available at https://myutc.utc.com/sikorskysupplier.

71.     Moreover, HSI Purchase Order 82734 specifies that "Supplier shall comply with the requirements set forth in this Order for controlling the configuration of Goods, supplies, or items required under this Order," that "All physical and functional configuration of Goods shall comply with the requirements of the Order," and that "Supplier shall, at its own expense, correct all physical and functional configuration discrepancies immediately upon discovery."

72.     HSI Purchase Order 82734 further requires that "Supplier shall flow down the applicable requirement of this Order to its lower tier suppliers."

73.     GEAS reviews each Purchase Order it receives from HSI before acceptance. In accepting Sikorsky's Purchase Orders, representatives from GEAS Contracts, Manufacturing Engineering, Quality, Production, and Planning Departments as well as a GEAS Vice President sign a Contract Review Form (SA-QAF061F), affirmatively indicating that the helicopter components Sikorsky is ordering are for "Military Application," that there are "Drawings Available" and that "Quality terms [are] clear & acceptable."

74.     Pursuant to the terms of its contracts, the claims for payment that GEAS issues to HSI include Certificates of Conformance certifying that: "the component parts and assemblies have been manufactured, inspected, and tested in accordance with the applicable drawings, specifications, and approved process in accordance with the requirements of the Purchase Order and/or Contract."

27

75.     Consistent with paragraph 42 above, on information and belief, the terms of all contracts and purchase orders between HSI and GEAS are terms that the United States requires HSI to impose on GEAS pursuant to the prime contract between the United States and HSI.

**D.     Contracts between GEAS and the United States Army**

76.     GEAS sells military helicopter components made to Sikorsky's drawings and specifications directly to the United States through contracts with branches of the Department of Defense, such as the United States Army.

77.     One of the contracts that the U.S. Army entered into with GEAS is Contract No. W58RGZ-09-C-0005 between US Army Aviation and Missile Command and GEAS, dated October 29, 2008, ordering 45 Shock Strut Assemblies (Part No. 70250-12051-045).

78.     GEAS submits its claims for payment under Army Contract W58RGZ-09-C-0005 to DFAS in Columbus, Ohio.

79.     The first page of this Army contract specifies that "Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein."

80.     The Army contract also incorporates and requires GEAS comply with Federal Acquisition Regulations.

81.     GEAS must comply with FAR 52.246-2 which requires that "The Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and shall tender to the Government for acceptance only supplies that have been inspected in accordance with the inspection

28

system and have been found by the Contractor to be in conformity with contract requirements. As part of the system, the Contractor shall prepare records evidencing all inspections made under the system and the outcome." Supplies are defined as including "raw materials, components, intermediate assemblies, end products, and lots of supplies." This FAR further specifies that "Supplies are nonconforming when they are defective in material or workmanship or are otherwise not in conformity with contract requirements."

82.     Second, GEAS must meet FAR 52.243-4000, a FAR provision whose text is spelled out in the contract document and specifies that "The Contractor shall not manufacture items for acceptance by the Government that incorporate a known departure from requirements, unless the Government has approved a RFD [Request for Deviation] or RFV [Request for Variance]. . . . The Contractor shall not submit items for acceptance by the Government that include a known departure from the requirements, unless the Government has approved [a RFD or RFV]."

83.     The claims for payment that GEAS falsely issued to the United States under the Army contract include Certificates of Conformance certifying that: "the component parts and assemblies have been manufactured, inspected, and tested in accordance with the applicable drawings, specifications, and approved process in accordance with the requirements of the Purchase Order and/or Contract."

###     E.     Contracts Between GEAS and the United States Navy

GEAS has also supplied parts, such as upper level assemblies that contain Drag Beams, to the United States Navy under Contract Nos. N00383-06-C-F127 and N00383-07-D-017F.

### F.    Foreign Military Sales

84.    GEAS also sells helicopter components to Sikorsky for use in military helicopters sold to the United States under the Foreign Military Sales Program. These components must comply with the Sikorsky requirements detailed above. They did not. GEAS' production of these helicopter components have the same known defects in manufacture, production and inspections as described for other contracts for the same products.

### G.    GEAS Supplies Nonconforming Drag Beams

85.    For Government prime contractors Sikorsky and HSI, as well as for the United States Navy, Defendant GEAS manufactures, assembles, inspects, and delivers components for models of Black Hawk helicopters, such as Main Landing Gears. A major component of Main Landing Gears are Drag Beams, Part Nos. 70250-22011-101 & 70250-22011-041.

86.    The following chart lists upper level assemblies that contain drag beams and the contracts under which GEAS sold and shipped these upper level assemblies to Sikorsky, HSI, and the United States Navy from January 1, 2007 to the present.

30

| Part | Contract / Purchase Order Number | Quantity shipped 1/1/2007 to present according to Sales Orders, Exhibit 60 |
|---|---|---|
| 70250-22010-043, Drag Beam, New | Sikorsky 5500008843 | 822 |
| | Sikorsky 5500036501 | 1,227 |
| | Sikorsky 5500049095 | 400 |
| | Sikorsky 5500066134 | 80 |
| | Sikorsky 5500078332 | 20 |
| | HSI 58942 | 57 |
| | HSI 67813 | 16 |
| | HSI 72546 | 6 |
| 70250-12062-104, Drag Beam, Old | HSI 37820 | 19 |
| 70250-12050-052 UH60 MG, L, Old | HSI 48006 | 1 |
| 70250-12050-053 UH60 MG, R, Old | Sikorsky 5700996999 | 13 |
| | HSI 48394 | 1 |
| 70250-12105-043, Drag Beam Assembly | Sikorsky 550026886 | 31 |
| | HSI 49597 | 16 |
| | HSI 82734 | 8 |
| 70250-32100-041 SH60 MG, Right | Sikorsky 5500042135 | 5 |
| | Sikorsky 5500044518 | 18 |
| | Sikorsky 5500054467 | 16 |
| | Sikorsky 5701001433 | 113 |

| Part | Contract / Purchase Order Number | Quantity shipped 1/1/2007 to present according to Sales Orders, Exhibit 60 |
|---|---|---|
| 70250-32100-049 SH60 MG, Left | Sikorsky 5500042632 | 5 |
| | Sikorsky 5500047197 | 2 |
| | Sikorsky 5500048863 | 1 |
| | Sikorsky 5700996999 | 46 |
| 70250-32100-046 Landing Gear Assembly | Sikorsky 5500026913 | 25 |
| 70250-32100-042 SH60 MG, Right | Sikorsky 5701001433 | 100 |
| 70250-32100-050 SH60 MG, Right | Sikorsky 5700042632 | 6 |
| | Sikorsky 5700996999 | 48 |
| 70250-32100-052 Landing Gear Assembly | Sikorsky 550026913 | 23 |
| | HSI 64110 | 1 |
| 70250-32105-045 SH60 Beam/Axle | Sikorsky 5500015869 | 10 |
| | HSI 37003 | 6 |
| | HSI 38348 | 16 |
| G70250-32105-045 SH60 B/A Govt | N00383-06-C-F127 | 43 |
| | N00383-07-D-017F | 30 |
| G70250-32105-045 SH60 B/A Govt | N00383-06-C-F127 | 43 |
| | N00383-07-D-017F | 44 |
| G70250-12062-104 DB Govt | N00383-06-C-F127 | 110 |
| | N00383-07-D-017F | 180 |

32

| Part | Contract / Purchase Order Number | Quantity shipped 1/1/2007 to present according to Sales Orders, Exhibit 60 |
|---|---|---|
| 70250-22009-041 UH60 MG, L, New | Sikorsky 570099699 | 68 |
| | Sikorsky 5500041745 | 23 |
| | Sikorksy 5500044551 | 23 |
| | Sikorsky 5500045617 | 23 |
| | Sikorsky 5500047343 | 10 |
| | Sikorsky 5500051891 | 17 |
| | Sikorsky 5500053909 | 20 |
| | Sikorsky 5500057898 | 6 |
| | Sikorsky 5500059099 | 8 |
| | Sikorsky 5500060299 | 6 |
| | Sikorsky 5701001433 | 261 |
| 70250-22099-042 UH60 MG, R, New | Sikorsky 570099699 | 88 |
| | Sikorsky 5500041803 | 23 |
| | Sikorksy 5500043950 | 4 |
| | Sikorsky 5500044552 | 22 |
| | Sikorsky 5500045620 | 23 |
| | Sikorsky 5500047343 | 10 |
| | Sikorsky 5500051914 | 20 |
| | Sikorsky 5500053910 | 20 |
| | Sikorsky 5500057898 | 2 |
| | Sikorsky 5500059099 | 8 |
| | Sikorsky 5500060299 | 6 |
| | Sikorsky 5701001433 | 258 |

| Part | Contract / Purchase Order Number | Quantity shipped 1/1/2007 to present according to Sales Orders, Exhibit 60 |
|---|---|---|
| **Total Number of Upper Level Assemblies Containing Drag Beams Sold & Shipped from 1/1/2007 to the Present:** | | **4,557** |

87.     Defendant GEAS did not produce the Drag Beams in accord with drawing and contract requirements, as discussed next.

### 1.   GEAS Failed to Cure Deficiencies In Drag Beams and Instead Circumvented Quality Requirements

88.     On January 26, 2010, Sikorsky issued a Corrective Action Report stating that GEAS had failed to follow the contractually mandated ASQR-01, which, as GEAS acknowledged, requires suppliers such as GEAS to perform product acceptance inspection of either (1) 100% of all dimensional characteristics or (2) those characteristics set forth in the supplier's approved quality control plan per ASQR 20.01.

89.     In accord with requirements of Sikorsky, GEAS contracted with a leading precision dimensional measurement laboratory, Q-Plus Laboratories, to inspect four Drag Beams of the Main Landing Gear (Part No. 70250-22011) produced by GEAS (Serial Nos. 04270, 04271, 04272, and 04273).

90.     These Drag Beams are designated as Flight Safety Parts by Sikorsky.

91.     On June 19, 2010, Q-Plus Laboratories issued a Report to GEAS. The scope of the inspection is listed as "all drawing defined external features that are conducive to measurement by CMM…"

34

92.    A "CMM" is a "Cordex Measuring Machine" that is capable of measuring physical characteristics of an object, including minute dimensions like those specified in the Sikorsky drawings.

93.    Each Drag Beam has 312 total drawing items and dimensions.

94.    After measuring those drawing dimensions conducive to CMM measurement, the June 19, 2010 Q-Plus Laboratories inspection report identified 154 separate dimensions on the four Drag Beams that did not conform with Sikorsky drawing specifications.

95.    A month later, GEAS resubmitted the same four Drag Beams to Q-Plus Laboratories for reinspection. This time, however, GEAS altered the Statement of Work for Q-Plus, eliminating from inspection 456 dimensional measurements. In this fashion, GEAS eliminated 98 of the features that Q-Plus Laboratories had rejected in its June 19, 2010 inspection from being reinspected. Thus, with a much more limited scope of inspection, Q-Plus Laboratories only found sixteen nonconforming dimensions on the four Drag Beams.

96.    GEAS then internally approved the four Drag Beams for shipment to Sikorsky for ultimate use in the production of landing gears used in models of Black Hawk helicopters.

97.    Despite these nonconformances, GEAS knowingly continued to deliver to Sikorsky between June 8, 2010 and March 4, 2011, at least 423 Drag Beams for use in military Black Hawk helicopters. Similar discrepant parts continued to be delivered through the present

98.    Additionally, on a number of occasions between 2007 and the present,

Drag Beams with open Nonconforming Material Reports ("NCMRs") were nevertheless approved and shipped to Sikorsky for inclusion in Government military helicopter landing gears without approval of the Sikorsky or GE Quality Department, as required by the terms of the contact between GEAS and Sikorsky.

### 2. GEAS Failed To Ensure that Drag Beams Conformed to Sikorsky Drawing Requirements

99. Sikorsky's drawings specify that Drag Beams, Part No. 70250-22011-101 and Drag Beam Assemblies, Part No. 70250-22011-041, each contain six holes technically known as clevis bores. These bores are empty in Drag Beams (Part No. 70250-22011-101). But in Drag Beam Assemblies (Part No. 70250-22011-041), bushing are inserted into the four bores on the far left side of the drawing, thereby decreasing their diameter.

100. Because Drag Beams (Part No. 70250-22011-101) are components of Drag Beam Assemblies (Part No. 70250-22011-041), at some point each Drag Beam manufactured by GEAS must meet the specifications for both Drag Beams and Drag Beam Assemblies.

101. The photo and model below show Drag Beams without bushings (Part No. 70250-22011-101). Four of the clevis bores at issue are on the far left side of the Drag Beam, the other two are on the far right side.

36

**Drag Beam Without Bushings**





102.    The photo and model below show Drag Beam Assemblies with bushings. The Drag Beam with bushings at issue here (Part No. 70250-22011-041) looks the same in relevant part to the Drag Beam without bushings (Part No. 70250-22011-101) except

37

that bushings are installed in the four clevis bores on the far left side of the Drag Beam. When bushing are installed into the two clevis bores on the right side of the drag beam, it becomes Part No. 7025-22014-102. That part is not at issue here.

## Drag Beam With Bushings



Drag Beam Clevis Holes With Bushings Installed



3D Model of Drag Beam With Bushings

103.     Sikorsky's drawings specify that the four bores on the far left side of the Drag Beam (Part No. 70250-22011-101) be located a fixed distance from two fixed reference points, or datum. Depending on the size of the diameter of each bore, they can only vary in their fixed distance from the datum, or have a maximum true position tolerance, of up to .003 inches from one datum and .011 inches from the other datum.

104.     Likewise, depending on the size of the diameter of each bore, Sikorsky's drawings specify that the two bores on the far right side of the Drag Beam (Part No. 70250-22011-101) have maximum true position tolerances of .0028 inches and .030 inches.

105.     When a bushing is installed into these bores on the Drag Beam, it becomes a Drag Beam Assembly (Part No. 70250-22011-041). As to this part, Sikorsky's drawings specify that depending on the size of the diameter of the bushing inside the bores, the bottom three bushings on the far left of the Drag Beam have a maximum true position tolerance of .0015 inches.

106.     The top bushing on the far left of the Drag Beam Assembly (Part No. 70250-22011-041) has a maximum true position tolerance of .0020.

107.     Sikorsky's *Drawing Interpretation Manual*, which Sikorsky's drawings for both 70250-22011-101 and 70250-22011-041 incorporates, specifies at A5.1.2.1 that as to dimensions, "Any deviation above the absolute maximum limit or below the absolute minimum limit constitutes nonconformance to the drawing."

108.     Sikorsky's ASQR-01 Appendix B, Gaging Methods & Geometric Dimensions and Tolerancing, requires inspections of these tolerances be performed by either a Cordex Measuring Machine ("CMM"), MMC functional gage, or layout

39

inspection.

109.    GEAS possesses a CMM that it can use to take measurements to ensure that the position of these various bores do not exceed the allowed tolerances.

110.    However, GEAS choose not to use its CMM—or any other acceptable method of inspection—on these bores in the Drag Beams to ensure compliance. This resulted in GEAS inspectors performing a "visual inspection" and placing a pin through the bores to see if they align. Neither of these are Sikorsky accepted methods of performing the inspection. In fact, a visual inspection of such minute distances is no inspection at all because it is impossible for the human eye to make such minute measurements.

111.    Moreover, on June 2, 2010, Relator emailed GEAS personnel Chad Knapke (Fabrication and Tanks Team Leader), David Forward (Quality Manager), and Sampath Dabare (Site Manager) advising them that GEAS' manufacturing process made it impossible for the bores on Part Nos. 70250-22011-101 and -041 to maintain their true position relative to datum within the required tolerance.

112.    In response to Relator's email, Mr. Knapke advised that Jim Dix (NC Programmer), Jeff Clark (Manufacturing Engineer), Viet Bui (Drag Beam Cell Lead), and Lionzo Alonzo (Final Inspector) would also look into this issue. On June 22, 2010, Mr. Dix responded by email: "No surprises here!" and confirmed what Relator discussed in his original email, stating "we are having problems holding true position tolerance."

113.    Relator also discussed this issue with GE Aviation Quality and Legal personnel headquartered in Cincinnati, Ohio. GE Aviation Quality and Legal failed to take any corrective action.

40

114.    Nevertheless, GEAS falsely certified that it met drawing requirements as to these Drag Beams and all Drag Beams produced and delivered to Sikorsky from 2007 through the present.

### H.    GEAS Knowingly Produces Black Hawk Components With Parts Made With Nonconforming Raw Materials

115.    GEAS subcontracts the manufacture of certain parts to its suppliers, such as (1) Pins Bearings used in Shock Strut Assemblies & Main Landing Gear Assemblies (Part No. 70250-12074-102) and (2) Clips used in Tail Landing Gear Assemblies (Part No. 70250-13162-102).

116.    Sikorsky supplies drawings to GEAS that specify both the dimensions of the parts that GEAS is to manufacture and the type of component material that GEAS is to use in manufacturing the parts.  Sikorsky requires GEAS to supply these drawings to its subcontractors.

117.    As also required by Sikorsky, GEAS' suppliers provide GEAS with certifications from third-party independent laboratories that the component material used to make these Pin Bearings and Clips meets certain requirements.

#### 1.    GEAS knowingly used Pin Bearings made from steel bar that did not meet Sikorsky's specifications to Manufacture Shock Strut Assemblies and Main Landing Gear Assemblies

118.    Sikorsky's drawings for the Pins Bearings (Part No. 70250-12074-102) require that the component material be steel bars .62 inches in diameter meeting MIL-S-6758 4130 physical condition C or D.  MIL-S-6758 covers steel, chrome-molybdenum (4130) bars and re-forging stock (aircraft quality).  Condition C is annealed steel. Condition D is normalized steel.  MIL-A-6758 was adopted as an Aerospace Material

Specification ("AMS") and is the same as AMS specification AMS-S-6758A.

119.    However, the certifications that GEAS' suppliers provided to GEAS from third party independent laboratories show that the steel used in the manufacture of these Pin Bearings was not .62 inches in diameter as required by Sikorsky, but instead was .5620 inches in diameter.  Nor did the steel meet MIL-S-6758 4130 physical condition C or D as required by Sikorsky.  Instead, the steel was certified to meet AMS 6370M, which pertains to steel, bars, forgings, and rings.

120.    In 2010, GEAS purchased at least 2,869 Pin Bearings (Part No. 70250-12074-102) made from nonconforming steel bars used in Shock Strut Assemblies and Main Landing Gear Assemblies for Sikorsky and for the United States that did not meet contract specifications in this respect.

121.    Shock Strut Assemblies and Main Landing Gear Assemblies made with nonconforming Pin Bearings were produced for and sold to Sikorsky under Contract Nos. 4701001433 and 4500086111 and Purchase Order Nos. 5701001433 and 5500057898.  Such parts were also produced for and sold to HSI under Purchase Orders 45662 & 82151.  They were also sold to the United States under U.S. Army Contract No. W58RGZ-09-C-0005.

122.    GEAS knew that it would either sell these parts directly to the United States for use in Sikorsky helicopters or that it would sell these parts to Sikorsky itself to be installed in helicopters that Sikorsky would supply to the United States.

123.    GEAS' documentation shows that these nonconforming Pin Bearings are used in military models of Sikorsky's Black Hawk helicopters.

### 2. GEAS knowingly used Clips made from aluminum sheets that did not meet Sikorsky's specifications to manufacture Tail Landing Gear Assemblies

124. Sikorsky's drawings for the Clips (Part No. 70250-13162-102) specify that the aluminum sheets used to make these Clips must meet specification QQ-A-250-5. This specification, and its identical AMS counterpart, AMS-QQ-A-250/5A pertain to Aluminum Alloy Alclad 2024, plate and sheet.

125. However, certifications from the third party independent laboratories that show that Clips GEAS was purchasing from its suppliers were made from aluminum that was instead certified as meeting AMS-QQ-A-250/4 and QQ-A-250/4E. QQ-A-250/4E and its identical AMS specification AMS-QQ-A-250/4 pertain to Aluminum Alloy 2024, Plate and Sheet.

126. Thus, the Clips that GEAS purchased should have been comprised of a core of aluminum alloy 2024 with thin layers of aluminum alloy 1230 bonded to both surfaces, as required by QQ-A-250-5. Instead, the aluminum sheets that GEAS actually purchased were comprised solely of 2024 aluminum alloy plate.

127. In 2010, GEAS purchased at least 305 Clips (Part No. 70250-13162-102) made from nonconforming aluminum sheets for use in manufacturing Tail Landing Gears.

128. Tail Landing Gears made with these nonconforming Clips were produced for and sold to Sikorsky under Purchase Order Nos. 5500066511, 5700996999, and 5701001433.

129. GEAS knew that it was selling these parts to Sikorsky to be installed in military helicopters that Sikorsky would supply to the United States.

130. GEAS' documentation shows that these nonconforming Clips are used in military models of Sikorsky's Black Hawk helicopters.

### 3. Relator alerts GEAS to its use of parts made with nonconforming raw material in the manufacture of components of Black Hawk Helicopters

131. In November, 2010, Relator realized that GEAS had purchased lots of Pin Bearings and Clips that, as described above, had been made from nonconforming raw materials and thus did not meet contract specifications. Pursuant to Sikorsky's contractual directives, Relator filled out Nonconforming Material Reports ("NCMRs") for these lots.

132. NCMR 524259 as compiled by Relator noted that a lot of 486 Pins (Part No. 70250-12074-102) had been made from nonconforming steel bar and thus did not meet the specifications of Sikorsky's drawings, as described above, and so should be returned to GEAS' supplier.

133. In further reviewing records, Relator found that an additional 2,383 Pin Bearings had been purchased in 2010 from the same supplier that did not meet the specifications of Sikorsky's drawings for the same reasons as the Pin Bearings at issue in NCMR 524259.

134. NCMR 524260 as compiled by Relator noted that 123 Clips (Part No. 70250-13162-102) had been made from nonconforming aluminum sheets and thus did not meet the specifications of Sikorsky's drawings, as described above, and should be rejected and returned to GEAS' supplier.

135. In further reviewing records, Relator found that an additional 182 Clips had been purchased in 2010 from the same supplier that did not meet the specifications

44

of Sikorsky's drawings for the same reason as the Clips at issue in NCMR 524260.

136.    Not only did Relator produce NCMRs for these open lots of Pin Bearings and Clips, he notified various GEAS managers of these issues, including David Forward (Quality Manager), Helvin Bacareza (Quality Engineer), Rachel Tonini (Quality Engineer), Vu Nguyen (Manufacturing Engineer), Sampath Dabare (Site Manager), Cory McDougal (Program Manager), Donald Hurtle (Supervisor of Assy and Test), Michael Weber (Materials Manager), Donna Bennett (Product Support Coordinator), Adam Murguia (Supply Chain Leader), and Brandon Wagner (Manufacturing Shop Operations Manager).

137.    Relator also notified these same persons that his review of these supplier's prior certifications revealed that material with incorrect certifications from the same suppliers had been used on previous lots accepted, stocked, and shipped by GEAS.

138.    The supplier who sold the Clips to GEAS agreed to scrap and replace the 123 aluminum sheets that were the subject of NCMR 524260. However, GEAS took no action as to the prior shipments of 182 nonconforming Clips from same supplier.

139.    GEAS did not notify either Sikorsky or the United States that nonconforming materials were used to make Clips for the Tail Landing Gear Assemblies, even though GEAS' own documentation shows that these parts have a military application.

140.    And GEAS took no corrective action at all as to the Pins made from nonconforming steel bars. Relator was told that GEAS' supplier would send a replacement certificate demonstrating that the raw material used in the production of the lot of 486 Pin Bearings identified by Relator in NCMR 524259 was correct. Without

45

testing or otherwise investigating the quality, composition, and contractual conformity of these steel bars, GEAS accepted this lot of 486 Pins. GEAS also took no action to verify the use of the required raw material in the production of the prior shipments of 2,383 steel bars from this same supplier. GEAS did not notify either Sikorsky or the United States that nonconforming materials were used to manufacture Pin Bearings for Shock Strut Assemblies and Main Landing Gears Assemblies, even though GEAS' own documentation shows that these parts have a military application.

141.    Sikorsky's SA0980 (rev. 12/15/2009) directs GEAS to "at its own expense correct all physical and functional configuration discrepancies immediately upon discovery."

142.    Despite notification from Relator that these suppliers were providing parts fabricated from nonconforming raw materials that GEAS used to manufacture landing gear assemblies, GEAS failed to identify all products manufactured by the suppliers in question and instead, certified that all of the products met the Sikorsky specifications at issue.

### 4. GEAS manufactured additional components of Black Hawk Helicopters with parts made from nonconforming raw material

143.    These suppliers sold still further nonconforming parts to GEAS for use in components of military helicopters manufactured by Sikorsky:

a.    **Part No. 70250-12074-101**: Differently configured steel Pin Bearings for Shock Strut Assemblies and Main Landing Gear Assemblies. These are also required by Sikorsky drawings to be manufactured from steel bars that are .62 inches in diameter and meet MIL-S-6758 4130 physical condition C or D. Instead, in 2010 GEAS accepted

46

1171 Pin Bearings from its supplier certified as being made from steel bars .75 inches in diameter and as meeting AMS 6370M. Parts made from these nonconforming Pins were produced for and sold to Sikorsky by GEAS under Contract Nos. 4500086111 and 4701001433 and Purchase Order Nos. 5500057898, 5701001433 & 5700996557. The same type of nonconforming parts were also produced for and sold to the HSI under Purchase Order 82151. And they were produced for and sold to the United States under U.S. Army Contract No.W58RGZ-09-C-0005. GEAS knew that it would sell Shock Strut Assemblies and Main Landing Gear Assemblies made with nonconforming Pin Bearings directly to the United States for use in Sikorsky military helicopters and that it would sell these parts to Sikorsky itself to be installed in military helicopters that Sikorsky would supply to the United States. GEAS' documentation shows that these nonconforming Clips are used in military models of Sikorsky's Black Hawk helicopters

  b. **Part No. 70250-13024-101**: These parts, Jack Pads used in Tail Landing Gears Assemblies, are required by Sikorsky's drawings to be manufactured from steel bars meeting MIL-S-6758, condition C. Instead, from 2008 through 2011, GEAS accepted 436 Jack Pads from its supplier made from steel bars certified to meet MIL-S-6758 condition B-1 or D. GEAS produced and sold these parts to Sikorsky under Contract No. 4700996557 and Purchase Orders 5500042628, 5500043712, 5500050231, 5700043712, 5500047488, 5500049259, 5500049312, 5500050228, 5500060299, 5700996999, and 5701001433. GEAS also produced parts containing nonconforming jack pads to HSI under Purchase Order 51118. GEAS knew that it would sell Tail Landing Gear Assemblies made with nonconforming Jack Pads to Sikorsky to be installed in military helicopters that Sikorsky would supply to the United States. GEAS'

47

documentation shows that these nonconforming Jack Pads are used in military models of Sikorsky's Black Hawk helicopters

      c.   **Part No. 70250-13053-103**: These parts, Retainers for Shock Struts Assemblies attached to Tail Landing Gears, are required by Sikorsky's drawings to be manufactured from steel bars meeting <u>MIL-S-6758, condition C</u>. Instead, from 2005 to 2010, GEAS accepted 408 Retainers from its supplier made from steel bar certified to meet <u>MIL-S-6758 condition B, B-1, or D4</u>. GEAS produced and sold these parts to Sikorsky under Contract Nos. 4500086111 and 4700996557 and Purchase Order Nos. 5500048918, 5500050230, 5700996557, and 5701001433. GEAS knows that it sells Shock Strut Assemblies made with nonconforming Retainers to Sikorsky to be installed in military helicopters that Sikorsky supplies to the United States. GEAS' documentation shows that these nonconforming Retainers are used in military models of Sikorsky's Black Hawk helicopters.

      d.   **Part No. 70250-13053-104**: These parts, differently configured Retainers for Shock Struts Assemblies attached to Tail Landing Gears, are required by Sikorsky's drawings to be manufactured from steel bars meeting <u>MIL-S-6758, condition C</u>. Instead, in 2009-2010, GEAS accepted 116 Retainers from its supplier made from steel bars certified to meet <u>MIL-S-6758 condition B or B-1</u>. GEAS produced and sold these parts to Sikorsky under Contract Nos. 4500086111 and 4700996557 and Purchase Order Nos. 5500048918, 5500050230, 5700996557, and 5701001433. GEAS knew that it would sell Shock Strut Assemblies made from nonconforming Retainers to Sikorsky to be installed in military helicopters that Sikorsky would sell to the United States. GEAS' documentation shows that these nonconforming Retainers are used in military models

of Sikorsky's Black Hawk helicopters

### I. GEAS' Quality System Allows Nonconforming Parts To Be Knowingly Sold And Shipped To Sikorsky For Installation In Military Helicopters Sold To The United States

144.     As described above, GEAS is contractually required to abide by and follow Sikorsky's SA 908 which imposes certain quality requirements, including the requirement that GEAS apply to Sikorsky's Material Review Board ("MRB") for approval before GEAS may repair or use-as-is any discrepant parts.

145.     When a discrepancy with drawing or specification requirements is found, GEAS operators, inspectors, or other personnel issue NCMRs, which detail the nonconformance and the disposition of the product. These forms contain a space for Sikorsky's MRB disposition if the part is submitted to Sikorsky for approval to repair or use as-is.

#### 1. GEAS fails to issue NCMRs and obtain MRB review of discrepant parts from Sikorsky

146.     GEAS Quality Inspectors accept non-compliant material from operators. . In fact, the Inspectors stamped-off on process paperwork accepting Sikorsky parts even though the very paperwork provided to the Inspectors established on its face that the fabricated part was out of tolerance with drawing requirements. No NCMRs are issued for the discrepant parts and no MRB review is ever requested or obtained from Sikorsky as to the discrepant parts. As a result, GEAS ships the discrepant parts to Sikorsky knowing that they will be installed on military helicopters sold to the United States.

147.     This occurred on eight Cylinder Assemblies for Shock Struts in Main Landing Gears, Part No. 70250-12065-102, manufactured under the LTA as part of

GEAS Work Order 15615-537 for Sikorsky in October through November 2010.[4]

148.     On February 14, 2011, two of these eight Cylinder Assemblies were shipped to Sikorsky—those with serial numbers 3548 and 3551.

149.     GEAS' documentation shows that nonconforming Cylinder Assemblies are used in military models of Sikorsky's Black Hawk helicopters.

### 2.     GEAS fails to properly close NCMRs by obtaining MRB review of discrepant parts from Sikorsky

150.     GEAS issued NCMRs finding that other parts had a nonconformances, but then failed to request MRB review by Sikorsky as required by their contracts. The NCMR was then unilaterally closed by GEAS and the nonconforming part shipped to Sikorsky with no notice to or resolution by the Sikorsky MRB.

151.     Quality Inspectors accepted the nonconforming parts, even though an NCMR was opened and never properly closed.

152.     One common method GEAS employed to get discrepant parts through assembly and shipped after an NCMR was issued was to disposition a part as "reconvene" and to allow a part to proceed to the next assembly. The nonconformance in the NCMR should then be considered and dispositioned at a later point. However, on the Work Order for the next assembly, GEAS failed to list the prior Work Order and Serial Numbers. Because of this, there is no way for GEAS personnel to "reconvene" and to consider the discrepancy at the specified later point. This occurred on NCMR 524784

---

[4] This also occurred on nine Cylinder Assemblies for Shock Struts Assemblies attached to Main Landing Gears, Part No. 70250-12065-105, manufactured under the LTA as part of GEAS Work Order 15615-657 for Sikorsky in September through November 2010. However, none of this product has shipped yet.

on Work Order 15615-537 for Part No.70250-12065-102.

153. Several examples of parts where NCMRs were opened but were not properly closed by obtaining MRB approval from Sikorsky are listed on the chart below:

| NCMR | Nonconformance | Disposition & Shipment |
|---|---|---|
| NCMR No. 521172 8/27/2009<br><br>Part No. 70250-22011-101<br><br>PO No. 5500036501<br><br>Sales Order No. 14508<br><br>Serial Nos. C701-03730 to C701-03737 | 8 Drag Beams should have been stress relieved / baked for 4 hours at 400 degrees F, +/- 10 F. Instead, parts were baked for 3 hours and 20 minutes at 400 degrees F due to oven malfunction | Dispositioned: "OK to continue processing to end of work order." No indication of MRB submission to Sikorsky or customer approval.<br><br>7 Parts shipped to Sikorsky on 11/6/2009. |

| NCMR | Nonconformance | Disposition & Shipment |
|---|---|---|
| NCMR No. 523197 6/11/2010<br><br>Part No. 70250-32100-048<br><br>Contract No. LTA 4701001433<br><br>Sales Order No. 15615 | For 7 Tire Wheel Assemblies - data required from supplier as required for two of the component parts, Part No. 70250-12801-101 & Part No. 70250-12049-101, only Certificate of Conformance available at GE Aviation | Dispositioned as "Reconvene. Pending resolution of TH 66576, continue to process to next level (71250-32100-041/042) Do not ship without customer approval." |
| | For Tire Wheel Assemblies, weight should be 41.5000 lbs + .5 lbs max. 5 of the 7 parts in this lot are also overweight, weighing 41.150 - 42.380 lbs. | Dispositioned as "Reconvene. Pending resolution of TH (No, Not available); continue to process to next level (71250-32100-041/42) Do not ship without customer approval." |
| | | No indication of MRB approval.<br><br>2 Parts shipped to Sikorsky on 6/16/2010, 1 part shipped to Sikorsky on 6/14/2010, 1 part shipped to Sikorsky 7/9/2010 |
| NCMR No. 523686 8/13/2010<br><br>Part No. 70250-32105-048<br><br>Contract / PO No. 5500026913<br><br>Sales Order No. 14151<br><br>Serial Nos. E583-01053 (K367-02805), E583-01086 (K367-02806), E583-01331 (K367-02807) | For 3 Drag Beam/Axle Assemblies - Axle should be baked and magnetic particle inspection after completion of brush cad plating per SS8805 & SS8407. Instead, baking and magnetic particle inspection are not complete. Reference receivers 282714 & 284642 | Dispositioned as "Submit. Parts submitted to Sikorsky on VR 1035748. Continue to process parts at GE risk."<br><br>No indication of MRB approval.<br><br>Parts shipped to Sikorsky on 9/9/2010. |

| NCMR | Nonconformance | Disposition & Shipment |
|---|---|---|
| NCMR No. 523749 8/20/2010<br><br>Part No. 70250-13166-042<br><br>Contract No. LTA 4701001433<br><br>Sales Order No. 15615<br><br>Serial Nos. IA01074 to IA01093 | For 20 Piston Assemblies - Parts should weight 2.776 lbs per Sikorsky parts list. Is overweight avg. 3.015/3.040 | All 20 parts dispositioned as "Submit to Customer for Disposition." Further dispositioned as "Continue to Process parts at [GEAS] risk, tech/vr will be submitted to [Sikorsky] for drawing update. Document NCMR on all new work orders at the identified hold points."<br><br>No indication of MRB approval.<br><br>4 parts shipped to Sikorsky on 10/13/2010, 2 parts shipped to Sikorsky on 10/14/2010, 1 part shipped to Sikorsky on 10/26/2010, and 5 Parts shipped to Sikorsky on 11/24/2010. |
| NCMR No. 523208 6/14/2010<br><br>Part No. 70250-13006-103<br><br>Contract No. LTA 4701001433<br><br>Sales Order No. 15615<br><br>Serial Nos. 25282 to 25306 | For 25 Actuators for Shock Struts, should be .090 dimension, but is .000. | Dispositioned: "Submit to Customer for Disposition via Sikorsky Tech Help #66674 reference VR# 1021034. Reconvene at final inspection op at highest level assembly."<br><br>10 parts shipped to Sikorsky on 8/6/2010, 7 parts shipped to Sikorsky on 7/13/2010, 1 part shipped to Sikorsky on 10/15/2010. |

### 3. Further evidence of the flawed nature of GEAS' quality system.

154. GEAS' quality system has systemic flaws. For instance, on September 2, 2010 GEAS Purchasing Buyer Sean Carpenter emailed Balwant Sandhu (Production Control-Planner), Adam Murguia (Supply Chain Leader), David Forward (Quality Manager), Simin Mosallaei (Quality Manager), Lionzo Alonzo (Lead Inspector), Felipe Turrubiartes (Quality Inspector), and Alex Arellano (Quality Inspector-Metrology), reporting that Sikorsky Part No. 70250-13159-103 was ready to be sent for penetrate testing. However, GEAS records already showed that this part had already successfully completed and passed penetrate testing. When Mr. Carpenter asked Mr. Alonzo about this premature entry, he was told to ignore the issue and that it would be fixed at a later date.

155. Relator also obtained a spreadsheet indicating where GEAS itself identified instances where product was shipped to Sikorsky even though discrepancies had been identified by GEAS' quality system.

### RULE 9(b), FED. R. CIV. P., ALLEGATIONS

156. Much of the factual information necessary to prove the allegations in this Complaint is in the exclusive possession of the Defendant GEAS.

157. Relator does not have access to the specific information regarding the false records and claims for payment referenced above as such information is in the exclusive possession and control of the Defendant GEAS.

## COUNT I
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) OF THE FALSE CLAIMS ACT

158.    The allegations in the preceding paragraphs are realleged as if fully set forth below.

159.    Defendant GEAS, by and through its officers, agents, and employees authorized its various officers, agents, and employees to take the actions relating to the conduct alleged above.

160.    Defendant GEAS "knowingly" violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b)(1). As to each of the above allegations, Defendant GEAS acted with actual knowledge of the alleged information, in deliberate disregard of the truth or falsity of the alleged information, and/or in reckless disregard of the truth or falsity of the alleged information.

161.    Defendant GEAS knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A) by virtue of making claims for payment for helicopter components to the United States and to prime contractors of the United States, Sikorsky and HSI, when it knew that the components that it sought payment for failed to comply with contractually required drawings and specifications.

162.    By so doing, Defendant GEAS intended to defraud the United States and intended that false claims be submitted to the United States.

163.    Thus, as set forth in the preceding paragraphs, Defendant GEAS knowingly violated 31 U.S.C. § 3729(a)(1)(A) and has thereby damaged the United States Government by its actions in an amount to be determined at trial.

164.    Such damages include:

a.    The cost to the United States of all nonconforming aircraft and aircraft components that it purchased;

b.    The cost of inspecting all nonconforming parts;

c.    The cost of undertaking a proper MRB determination;

d.    The cost of repairing and replacing all nonconforming parts;

e.    The cost of labor necessary to inspect, undertake an MRB determination, and to repair and replace parts; and

f.    The cost of fleet down time while nonconforming parts are inspected.

## COUNT II
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(B) OF THE FALSE CLAIMS ACT

165.    The allegations in the preceding paragraphs are realleged as if fully set forth below.

166.    Defendant GEAS, by and through its officers, agents, and employees authorized its various officers, agents, and employees to take the actions relating to the conduct alleged above.

167.    Defendant GEAS "knowingly" violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b)(1). As to each of the above allegations, Defendant GEAS acted with actual knowledge of the alleged information, in deliberate disregard of the truth or falsity of the alleged information, and/or in reckless disregard of the truth or falsity of the alleged information.

168.    Defendant GEAS knowingly made or caused to be made a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §

56

3729(a)(1)(B), when it made Certificates of Conformance that the helicopter components that GEAS sold to the United States and to United States' prime contractors, Sikorsky and HSI , conformed to all contractually required drawings and specifications, when in fact, GEAS knew that they did not conform.

169.    By so doing, Defendant GEAS intended to defraud the United States and intended that false claims be submitted to the United States.

170.    As set forth in the preceding paragraphs, Defendant GEAS knowingly violated 31 U.S.C. § 3729(a)(1)(B) through its making or causing to be made these Certifications and thereby has damaged the United States Government by their actions in an amount to be determined at trial.

171.    Such damages include:

a.    The cost to the United States of all nonconforming aircraft and aircraft components that it purchased;

b.    The cost of inspecting all nonconforming parts;

c.    The cost of undertaking a proper MRB determination;

d.    The cost of repairing and replacing all nonconforming parts;

e.    The cost of labor necessary to inspect, undertake an MRB determination, and to repair and replace parts; and

f.    The cost of fleet down time while nonconforming parts are inspected.

## COUNT III
## 31 U.S.C. § 3730(h), RETALIATION

172.    The allegations in the preceding paragraphs are realleged as if fully set forth below.

173.    Relator was hired by Smiths Aerospace on August 28, 2006 as Project Manager. He received an positive assessment for 2006 from his manager, Richard Sutton.

174.    For 2007, after GEAS acquired Smith's Aerospace, Relator received another positive assessment from his manager, Richard Sutton, who recommended Relator for the position of Director of Manufacturing Engineering.

175.    In July 2008, Relator was promoted to GEAS Manufacturing Manager over Cell 1, Aerial Fuel Tanks and Assembly, managing approximately fifty employees.

176.    For 2008, Relator received an overall rating as "Excellent" from his manager, Richard Sutton.

177.    In April 2009, Sampath Dabare replaced Richard Sutton as Site Leader at the GEAS Santa Ana facility.

178.    Beginning approximately in April and May 2009, Relator informed his superior, Sampath Dabare, and other employees at GEAS about Defendant GEAS' unlawful activities in violation of the contractual duties referenced above on military contracts involving claims for payment from federal funds.

179.    In December 2009, Mr. Dabare informed the management team, including Relator, that the Cell Leader positions were going to be split up and that Relator's position would be split into two new Cell Leader roles. Each Cell Manager would have to

58

bid on their position in order to retain the position.

180.    In January 2010, Relator was informed that he would not be a Cell Leader and that his subordinates would take the two new Cell Leader roles that formerly Relator had filled. The other two Cell Mangers retained their position.

181.    In late January 2010, Mr. Dabare informed Relator that he would be a Manufacturing Engineer, but that he retain responsibility for the Street Widening Project at the GEAS Santa Ana facility.

182.    Relator had occupied an office in an area near where the other Manufacturing Engineers were located. There were several brand new empty cubicles open and available in this area. However, Relator was informed that he would work from a desk in the middle of the factory.

183.    Not until September 2010 was he permitted to move to a cubicle adjacent to the other Manufacturing Engineers.

184.    In June 2010, Relator's wife, Kathleen Adler—who also works at GEAS' Santa Ana facility—was removed from her position as Facility Manager and it was posted for bid. Relator and three other employees bid on this position.

185.    Relator was permitted to interview for the Facility Manager position with Mr. Dabare and a Human Resources Intern.

186.    The interview turned out not to be an interview, as Mr. Dabare informed Relator that he had identified a better manager than Relator for this position. Mr. Dabare also informed Relator that he would no longer be responsible for the Street Widening Project and that a new Facility Manger would have this responsibility.

187.    Directly after this "interview," the new Facility Manager was announced.

188.    Following his complaints, Relator received poor evaluations for 2009 and for 2010.

189.    To the present date, Relator continues to be employed as a Manufacturing Engineer for GEAS.

190.    Throughout this time, Relator continued to inform his superiors, including Mr. Dabare, and other employees at GEAS about Defendant GEAS' unlawful activities in violation of the duties referenced above.

191.    In addition, Relator described GEAS's unlawful activities on these military contracts to its corporate counsel from GE Aviation headquarters in Cincinnati by detailed emails and in two separate meetings.

192.    Relator was demoted and his responsibilities were stripped from him by GEAS because of his lawful acts undertaken:

    a.    in an attempt to assure compliance with the terms of GEAS' contracts with the United States and with the United States' prime contractors pertaining to the manufacture, assembly, and quality assurance requirements for component parts of various United States jets and helicopters, and

    b.    to stop violations of the False Claims Act.

193.    Thus, Defendant GEAS' demotion of Relator was violates 31 U.S.C. § 3730(h).

194.    Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to all relief necessary to make him whole and to damages resulting to his reputation and continued career opportunities as a result of Defendant GEAS' illegal demotion, including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of himself and the United States of America, pray as follows:

(a)   That this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. § 3729(a), and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

(b)   That the Relator be awarded all costs incurred, including reasonable attorneys' fees, in accord with 31 U.S.C. § 3730(d);

(c)   That, in the event the United States Government elects to intervene in this action, the Relator be awarded between 15% and 25% of the proceeds of the action or settlement of the claims in accord with 31 U.S.C. § 3730(d)(1);

(d)   That, in the event the United States Government does not intervene in this action, the Relator be awarded between 25% and 30% of the proceeds of the action or of the settlement in accord with 31 U.S.C. § 3730(d)(2);

(e)   That, in accord with 31 U.S.C. § 3730(h)(2), Relator be awarded reinstatement with the same seniority status he would have had but for his demotion, 2 times the amount of back pay, interest on the back pay, and compensation for all special damages sustained as a result of his demotion, including litigation costs and attorneys' fees

61

(e)     That the United States and the Relator be awarded prejudgment and

postjudgment interest; and

(g)     That the United States Government and the Relator receive all relief, both

at law and in equity, to which they may be reasonably entitled.

Respectfully submitted,

James B. Helmer, Jr. (0002878)
Paul B. Martins (0007623)
Erin M. Campbell (0079083)
Helmer, Martins, Rice
        & Popham, Co., L.P.A.
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
T: 513.421.2400
F: 513.421.7902
pmartins@fcalawfirm.com
*Trial Attorneys for*
*Relator Jeffrey W. Adler*

62